Thank you, Your Honor, and good morning. My name is Jonathan Feinberg and with my co-counsel David McLean seated at council table, we represent the plaintiff appellants James Davis Bennett and Pamela Bennett. My intention is to reserve three minutes of rebuttal time. All right. This is an extraordinary case. First, the case involves the extraordinary misconduct of five medical practitioners at the Federal Correctional Institution at Lompoc who seriously delayed care for a treatable illness and then resulted in James Davis Bennett suffering from permanent disability. It is also an extraordinary case because of extraordinary actions by the district court judge in its rulings throughout the course of this case which deprived the plaintiffs, James Bennett and Pamela Bennett, from their recognized ability to elect their remedies. Can I just ask you in terms of the inner relationship between these cases, if this court affirms in the FTCA case, then that's a judgment bar for the Bivens case and if we affirm in the Bivens case, there's nothing left for the FTCA case. Is that right? Well, if the court were to affirm in with regard to the first scenario, I agree that if the court were to affirm in the FTCA case, that would almost certainly preclude the Bivens case. One could imagine a scenario where the Bivens claims may remain. It's difficult for me to imagine that, so I would concede that. Should the court remand on the Bivens claims, that does not necessarily terminate the FTCA claims. No, my question was if we affirm the grant of summary judgment in the Bivens case, it's over, isn't it? Yes, I would agree with that. Let me ask you the third thing you said. Let's assume that we were to remand, whatever we do with the Bivens claims, and we vacated the FTCA dismissal. Isn't the FTCA case time-barred? In other words, if you asked to dismiss it without prejudice, let's assume we said, you're right, you should have been able to dismiss it without prejudice. At this point, isn't it time-barred? Maybe, and I say maybe because our first request for relief on the FTCA case is that the court reverse the district court's decision on the stay issue. Right, so let me, let me, let me, I was trying to be precise in my question. Let's assume that we find that the district court didn't abuse its discretion in not staying, but did abuse its discretion in declining your request to dismiss without prejudice. At that point, isn't your claim time-barred if we set it back? I agree. Okay. And should the court do that, I can't imagine any scenario where we would try to resurrect the FTCA. Okay, I'm just trying to figure out all of our options here. Exactly. The one exception, and let me acknowledge this is a complex case procedurally, if the court were to reverse the district court on the ruling as to the timeliness of the Arizona based claims, where the district court ruled that those claims were barred by the statute of limitations, if the court were to reverse that claim, and we have raised that issue. See, my problem is, and we're now mucking with the procedure, and I know you want to get to the merits, I don't know how we get to that, the Arizona based claims, because they all, they're in the FTCA case, correct? They are. And so either, either the judge correctly dismissed with prejudice, in which case we don't get to them, or if we find that he shouldn't have dismissed with prejudice, the case is then, we don't have a final order from which we can review those claims. Well, I would, given how those claims were resolved on summary judgment, I believe that the court could craft a... You think you could, you think you could dismiss a case without, without prejudice? That's what you sought to do, and let's say what the judge should have done that, and then appeal a interlocutory summary judgment ruling in that case? That's, I believe that we can. I could, I could be correct. I have some difficulty coming to that conclusion, but let's get you out of the procedure and get... Thank you, and I appreciate, and in light of the way we've presented the arguments, I think that's probably an unlikely scenario. Obviously, we have pressed forward with the Bivens claims as our lead claims. In effect, if I could turn to that now, I, my submission to the court, and this certainly was the message I intended to communicate at the beginning, is that when you look at the way the Bivens claims were litigated, and you look at the district court's ruling on the Bivens claims, that helps to that we had, because the record that was established with regard to the Bivens claims was, I would suggest to the court, probably one of the more straightforward case, cases of deliberate indifference that you would see if you review deliberate indifference cases. Let me ask you about that. The, if I understand it correctly, the claim is not deliberate indifference to the POTS disease. Correct. It is deliberate indifference to the back pain issues that your client was articulating. I would take it one step further. It was deliberate indifference to the back pain with obvious evidence of spinal cord compression. Okay. The record that we see is perhaps medical care that, at the end of the day, didn't do what it should have done, but a lot of attention to your client. Tests were run, checking in with your client. Granted, some of the medical professionals had some questions about whether or not there was malingering and but this is certainly not a case where no one paid attention to your client. But that is not a defense. The, and this court has been clear. If we look back to Lopez versus Smith, the court said the mere provision of medical treatment over time does not constitute a defense to claims of deliberate indifference. Let me ask, you've got five defendants, right? Yes. Is your case the same as to all? We have, we have non-MDs early on in the process, particularly the first practitioner who regularly meets with your client, provides him with pain medication. I don't know whether she's supposed to recognize a more serious problem. When you say first practitioner, are you referring to the nurse? Yes. So it seems to me that you're, it's not, this is not joint and several liability. We're trying to talk about the individual liability of which of the five do you have the best case of deliberate indifference? As to Dr. Dollywall, and that is because of Dr. Dollywall's frank admission that as of April 9th of 2012, less than a month after Mr. Bennett arrived at Lompoc, he knew, and this is his deposition testimony, he was explicit. He knew that based on Mr. Bennett's prolonged complaints of back pain, he said that he had had back pain since January. That's number one. Number two, the unexplained weight loss, Dr. Dollywall knew at that time that there was a pathology. No, he didn't say he knew. He said this suggests a serious pathology. Right, okay, and then that's, I think that's, that's a fair characterization of the testimony. A jury can infer that he either knew or was recklessly indifferent at that time. Once he knew, once he knew or had, was reckless, knew, once he had reason to suspect a serious pathology, what did he do thereafter? Ordered pain medications, ordered an orthopedist referral that he did not follow. Ordered an MRI? He did not order an MRI. The MRI was ordered by MLP Tejada. Right, it had already been ordered, so he knew an MRI had been ordered. That's, well, that was two months later. And what's up, what's up? I'm trying to figure out whether, how does that, it may be malpractice, it may be a great FTCA case, but why, how does that amount to eighth and eighth amendment violation? Well, because of three, there is a chain of three factual conclusions that a jury could reach. Remember, this is on summary judgment, right? And this is, and the critical problem that we see with the district court's ruling is that it did not evaluate, assess, or even consider any of the evidence that we presented. The three key facts, I want to boil this down to the simplest fact. One, the simplest point. One, is that they knew, each of the defendants knew, at some different time, Dr. Dollywell was the earliest, that Mr. Bennett had evidence of a spinal pathology. Number two, they all acknowledged in their deposition testimony that when there is evidence of a spinal pathology or a spinal infection, that is a serious problem which can be disabling or even fatal, and Dr. Dollywell ticked off a list of diseases that one would have to deal with. I'm willing to, for purposes of answering my question, let's assume that your client had a serious problem and that each of the, each of the five defendants had reason to know it or knew it. I want to focus on deliberate indifference or subsequent treatment after they knew that. And that's the third key point, which is they knew that once you have that evidence, the key diagnostic measure that you have to pursue is an MRI. And we saw that. There's no question that that's what you're supposed to do. Go back on the practitioner that ordered the MRI. That was Mr. Tejada. Right. After ordering that MRI, what deliberate indifference did Mr. Tejada... He ordered a routine MRI at a time that he was in emergency condition. And he ordered that MRI... And he knew that Mr. Bennett was also going to be seen by a doctor. And so I'm trying to figure out how, I'm having great difficulty with your argument about the practitioners, all of whom are operating in a system where there's a physician that's going to see Mr. Bennett. They order tests, they provide stuff. Isn't it enough for a practitioner to pass them on to the physician and say, here's what we've done? No. I could see the court reaching a conclusion which finds that the doctors, Dr. Dhaliwal and Dr. Gross, were most responsible for Mr. Bennett's care. Then I want to focus on the far end, which is the last doctor who really is a paperwork doctor. Dr. Gross. Would you like me to address Mr. Tejada? No. As to Dr. Gross, how was he deliberately indifferent? Dr. Gross acknowledged in his deposition testimony that as the physician, he knows that he has a responsibility to ensure a timely MRI, particularly in an emergency situation. He knew from Mr. Tejada's documents, the report that Mr. Tejada prepared on May 25th of 2012, that there was evidence of toxic neuropathy. He knew, and a jury could certainly infer if he doesn't acknowledge it, that that's a serious condition, that it requires immediate treatment. He knew that a timely MRI was needed. And if he sees that a mid-level practitioner operating under his supervision did not perform that necessary task of ordering a timely MRI, that's his responsibility. In the malpractice area, I mean, the language of the cases, this one is the JET case, where it may appear, indifference may appear, where officials deny, delay, or intentionally interfere with medical treatment. I mean, that's not what's happening here. At most, at most, these people are a bit asleep at the switch, perhaps. But they're not doing affirmative things to effectively interfere with medical care, and that seems to be the standard. Let me push back on that, if I could. I respectfully disagree as to the characterization that they're asleep at the switch. If we look at this court's ruling in JET, this is a man who had a fractured thumb, who needed follow-up care, and the doctor, who was the main defendant there, ordered a routine X-ray for a fractured thumb. In this case, Mr. Tejada, approved by Dr. Gross, also acknowledged by Dr. Dhaliwal, ordered a routine MRI for a spinal condition, which they knew was likely to be permanently disabling or fatal. This is, if we take, if JET is at the middle... So they, in your view, the doctor prescribed the wrong test. No, not the wrong test. They did not take the emergency steps that were required. Everybody knew, and if I could characterize... Now, move backwards. If that's your, and I think that is your best argument, I'm moving back to the first two people on the chain. That's Dr. Dhaliwal and Nurse Pennell. They knew back in April, and... No, I'm moving back to the practitioner that first saw your client, the very first visits. Nurse Pennell. Yeah. So how is she deliberately indifferent? Nurse Pennell, so the strongest evidence we have as to Nurse Pennell, and I see that my, I'm getting into my rebuttal time here, maybe if I could answer this question and then return on rebuttal. Go ahead. Nurse Pennell had documentation handed to her by James Bennett in late May or early June, which said, I think I, and he said to her, I think I have POTS disease. Here it is. She, according to his testimony, and remember, summary judgment... You're not complaining about the POTS disease in this case. No, but it's, and we don't have to prove that. If we had to prove it, I think we could in light of that evidence, but we don't have to in light of the fact... Oh, you not only don't have to, you said, your brief says you're not seeking damages for it. Well, oh, well, no, I, I... For the failure to diagnose the POTS disease. You're saying that's not deliberate indifference. That's what your brief says. That's right. Okay. Our, our argument is that there is deliberate indifference to a serious spinal condition which, which they knew to be dangerous, potentially fatal. Okay. I understand. As to Nurse Pennell, just to finish, the, the fact that she was handed information which should have set off alarm bells, and that's the phrase that I would use. All of these defendants had information which should have raised an alarm for emergency action. It did not. They failed to seek what they knew was needed. That is the quintessential case of deliberate indifference. I'd reserve the rest of my time for it. All right. Thank you. Thank you. Good morning. May it please the Court. Assistant United States Attorney Garrett Coyle, along with my colleague, Assistant United States Attorney Keith Staub, we represent the United States in the Federal Tort Claims Act appeal, and the individual doctors, nurse, and physicians assistants in the Bivens appeal, and I'd like to begin with the dismissal of the FTCA case for failure to prosecute, because that decision, if affirmed, resolves both appeals in their entirety. So doesn't the case law say that absent some showing of prejudice to the other side, a party should be allowed to dismiss its case without prejudice. It, so if you were to get past the threshold issue of the, the dismissal for failure to prosecute. No, I'm moving back in time. Before the judge dismissed for failure to prosecute, at least a month before, and probably earlier than that because the stay application really involves the same issues, the other side said, Judge, we'll dismiss this case without prejudice. And the judge said, Nope, can't do that. And our case law says that it's an abuse of discretion to refuse a request to dismiss without prejudice, unless there's a showing of real harm to the other side. I have, I can't find that showing in this record, so help me, tell me why, Judge, the district judge didn't abuse his discretion in denying that motion. We think that the prejudice was the loss of the FTCA judgment bar defense to the Bivens defendants and to the- No, that can't be. The argument about, the argument about prejudice can't be, well, we would have won the lawsuit and therefore consequences should have come from it. They said, we're willing to give up, right now, this case, preserving our right to bring it in the future. Nothing about the second lawsuit would have affected the first. You could have won the second lawsuit and they still would have been able to pursue the first. So, other than the fact that you might have won it, what's the prejudice to the government? Well, it doesn't matter if we won or lost the FTCA lawsuit. A judgment favorable or not in the FTCA suit triggers the judgment bar and bars the Bivens case. So once that- But that's still, your argument is, we would, your argument is essentially, we would rather try the Bivens case first. And the other side said, we would rather try the FTCA case first. And the other side said, no, we'd rather try the Bivens case first. So, why is it an abuse of discretion for the judge to refuse their request to dismiss with prejudice? Well, I would also point out that it doesn't matter which case is tried first. So, even if they got what they wanted and tried the Bivens case first, if there's a subsequent FTA, FTCA judgment, that would retroactively- Sure, and what they wanted to do, as was their right if they had a good Eighth Amendment case, was to try it to a jury. And so they said, Judge, we would prefer to try our Eighth Amendment case, which is harder to prove to a jury, rather than try our malpractice case to you. And the judge said, no. And I'm trying to figure out why that's not an abuse of discretion. The judge said it's too late to do that without prejudice, because Congress, in enacting the judgment bar, was trying to prevent duplicative litigation and reduce the strain on employee morale and government resources caused by- But they were in that position only because of the denial of stay, right? What- Once the District Court says, I'm not going to grant you a stay, what other strategic choice was left to the plaintiffs if they wanted to try the Bivens case first? You know, I think if they had done that early on in the FTCA case, if they had done it before summary judgment, before the statute of limitations had run on the FTCA claim, then they would have been entitled to dismiss the FTCA claims without prejudice and avoid the judgment bar. Was there lack of diligence on this record? Yeah, I think there is. They were dilatory. You know- What do we make of the fact that it wasn't at the government's position to stipulate to that at one point? No, we were willing to stipulate to consolidate the two cases together, to try them together. And the Bivens aren't challenging the denial of that consolidation here, but it wouldn't have made any difference for purposes of the judgment bar. You opposed the dismissal without prejudice? Yes, we did. But it wouldn't have made any difference. If the cases had been consolidated, if anything, the Bivens would have been in a worse position because once we won summary judgment in the Bivens case, they couldn't have brought an immediate appeal. So your position amounts to when somebody has an FTCA claim and a non-FTCA claim arising at the same set of events, they can be forced to try the FTCA claim to the judge first? No, I don't think so. I think the sequencing of the trial- Well, so that's your defense. You're saying the way we were prejudiced was we lost the benefit of the judgment bar that might have arisen from the FTCA case. So it seems to me you're necessarily saying the judge can force them to try the FTCA. He wouldn't consolidate them. He can force them to try the FTCA case first, foregoing their right to a jury on the Eighth Amendment claims, and then say on the Eighth Amendment case, no matter what happens, where there's a greater remedy, there's punitive damages, you're out of luck because your case is barred by the FTCA judgment. Well, I think that's Congress's judgment in enacting the FTCA's judgment bar. It is saying once you take the FTCA claims far enough into a suit that you are going to get a judgment, we want to buy peace for our employees. When the government agreed to stipulate to consolidate the case, were there discussions between the parties as to whether the FTCA or the Eighth Amendment claim was going to try first, be tried first? I think the discussion was that it would be a joint trial, but we were still moving for summary judgment in the Bivens case. So we, and we won summary judgment. So then the FTCA trial would have proceeded as scheduled. Maybe you can move on to the Bivens claims, because as I think your colleague candidly admitted, unless we affirm the FTCA bar, even if we reverse it on that one, even if we send it back, it probably makes no difference. So why, wasn't there enough evidence here to get past the summary judgment threshold, at least as to the doctor whose name I can't pronounce that begins with a D? Dr. Dhaliwal, well, so I would emphasize three points in response to the deposition testimony that Mr. Feinberg cited. First of all, the exact deposition testimony was, quote, we need to investigate what was going on with Mr. Bennett's back. And the Eighth Amendment looks not only at what you knew, but what you did in response. And so on April 9th, that's the date when he said he thought we needed to investigate, he in fact ordered eight lab tests, a scan, a new medication that was designed to treat what he thought was the underlying problem, a new pain medication, and he re-upped the existing pain medication. Focus on the MRI for me, if you would. As I understand it, when Dr. Dhaliwal first sees Mr. Bennett, an MRI has already been ordered by somebody else or not? No, I don't think so. Not the first time. But then an MRI is subsequently ordered by one of the non-MD personnel. And Dr. Dhaliwal approved the MRI. Approves it. And it's a routine MRI. Correct. Which is to say, we'll put the order in and this will What your colleague on the other side is saying is that that was gross indifference or deliberate indifference to Mr. Bennett's condition because it was clear that he needed an emergency MRI. And we do have a case involving, well it's MEM-DISP, involving an MRI. So why isn't, given all that, why isn't that enough to get to the jury on the MRI issue? Well, if I can address the And it's not precedential, but it at least, you know, gives some support to their position. But I think the difference there is that there you had a doctor who was a non-party to the case who ordered an MRI, and then you had non-treating prison administrative officials who delayed it. So that's different. Here you got the treater himself who orders an MRI and in his exercise of his medical judgment, determines that it's appropriate to order it on the standard routine timeline. And there is no indication. Let have you focus on this. It was at the end of May when Tejada saw Mr. Bennett and his pain had progressed to the point where Tejada felt was appropriate to order an MRI, correct? Correct. Because his pain was not getting better. They were medicating him to no avail. And then in June, the following, I think this was May 25 when the MRI was ordered. By June 1, so we're talking about a week later, he was wheelchair-bound and couldn't even walk. And then in July, he basically was bedridden, right? Between June and July, why wasn't the MRI rushed? Which they did do when they saw him at bedside a month later. There's no evidence in the record of why it was or wasn't rushed at that point, but... Well, isn't that where the deliberate indifference claims comes in? You have somebody who's suffering from severe progressive pain. There's strong indicators that would have triggered an immediate MRI to be ordered, and it wasn't ordered. And so the severity increased during that time is at the heart of their deliberate indifference claim. I would make two points. First is, in a Bivens claim, there's no vicarious liability. So MLP Tejada ordered the MRI at that point, but he did not see Bennett again repeatedly. And that's why I was focusing on separate people. So let's assume that Tejada was fine. Ordered the MRI, that was... But Dr. Dhaliwal continues to see... I don't think so. Well, as I see this, he's visiting somebody in the clinic in May and June. In June, he visits the clinic four times and complains of very severe back pain. Now, it's not quite clear to me during that period from the record who it is that sees Tejada. Tejada thought it was serious enough to order a routine MRI, because the x-ray didn't diagnose the problem. June 1, he's back. Tejada gives him injections. Dhaliwal co-signs Tejada's note. So at that point, within five days, he's now in a wheelchair. Doesn't that suggest that the MRI needed to be moved up? I don't think... On both Tejada and Dr. Dhaliwal's part. I don't think so. They gave Mr. Bennett the wheelchair to alleviate his pain, but there is no evidence that they had any indication that he needed the MRI on an emergency basis. Now, I think what Your Honor's questions are referring to is maybe... Tejada notes that Bennett's mobility is markedly affected. His gait is slow. He can't walk, and when he walks, his head is almost close to the level of his waist when walking. That's not a marked increase in severity of his mobility presented with on May 25th, but I think... So is there any combination of symptoms that Mr. Bennett could have presented between May... When was the MRI ordered? May 25th and July 12th, when he had the MRI. Is there any combination of symptoms that he could have presented that would have resulted in a triable issue on a little bit of indifference? Or is it your position that, since they were seeing him, it didn't matter? No, I think there could. I mean, the Eighth Amendment looks at... Deliberate indifference looks at two things, what they knew and what they did. So the more they know, obviously, then it calls for them... Why isn't what they knew here... Judge Wynn has read it to you from the record. He had somebody who was in severe pain, in a wheelchair, was walking with his head down, needed constant pain medication and injections. Why isn't that enough? And they've already determined that his condition requires an MRI as a diagnostic tool. Why isn't that enough to say, we better get this guy in for this MRI a lot quicker? I think that shows should have known. They arguably should have known at that point, but I... But that's why I asked the question. So what combination of evidence would be necessary, in your view, to get past the should have known to deliberate indifference? Well, when Mr. Bennett woke up in his bunk and he couldn't move his legs, that was the kind of symptom that required an emergency... So if they hadn't sent him for an emergency MRI at that point, that would be an Eighth Amendment violation? I think so, yes. But until that point, you don't think it was? No, I don't think so. So the difference is bedridden and paralyzed versus being a wheelchair and bent at the waist, losing an inability to walk within five days isn't enough? I don't think it was enough in this case. I mean, I think maybe... Compare these facts to the facts in Jett, the fractured thumb case, and tell me why this doesn't present a more compelling set of circumstances. We're not talking about prevailing on the merits. We're talking about creating a sufficient trial issue for purposes of sending it to trial. So why is it enough in Jett and not in this case? Well, in Jett, I think the difference is the defendants knew exactly what the plaintiff's condition was from day one, and they knew what he needed, and yet they still Here, there's no dispute that the defendants did not know that Mr. Bennett had this one-in-a-million condition. That's true, but what I'm hearing from your counterparts is these medical professionals are treating Mr. Bennett as they would treat someone who says, my back hurts, and they're treating it. Whereas they had an indication that it was something more, there was pathology that indicated it was something more than just his back hurts, but all they did was treat him as if his back hurts. Isn't that essentially what they're... I don't think so. I do not think that is what the record shows. The record, first of all, pathology just means abnormality. They knew there was something abnormal going on with his back, and they did something in response. They ordered tests. They ordered 17 lab tests. They ordered nine different medications, and medications not just to treat and mask the pain, but also medications to address what they thought was the underlying cause of his with an outside orthopedist. They ordered an MRI, and when he woke up in his bunk paralyzed, they ordered an emergency MRI. Can you help me with the record? After Mr. Bennett first sees Dr. Dhaliwal, and between then and July 12th, who does he see in the clinic? Can we tell? The dates, I'm sorry? Sure. He first sees Dr. Dhaliwal in June of 2012? No, he sees Dr. Dhaliwal in April. Okay, well so now focusing on June of 2012, and he comes to the clinic four times, at least complaining. Who does he see? He sees MLP Tejada on June 9th. Right. June 22nd as well. I believe he saw an MLP named Estella Casino, who is no longer a party in this case, and he saw MLP Rivera. So is there, what I'm focusing on that is, Dr. Dhaliwal sees him in early June, correct? After the MRI is ordered. Am I wrong about that? Yes, I think you are wrong about that. I do not think Dr. Dhaliwal... But let me ask the same question in a different way. We have somebody who presents all these symptoms. An MRI is ordered because Tejada thinks it's a reasonable diagnostic tool, and you're the doctor in charge of this patient. Do you have some responsibility at that point to look at all this and say, oh my gosh, we need to move this stuff up. The non-MDs have done as good a job as we can expect a non-MD to do, but I'm in charge of this case, and once I see all this stuff, as he says, it suggests a serious pathology. Letting it wait for two months for an MRI is not appropriate. There is no evidence that Dr. Dhaliwal ever reviewed the case on an ongoing basis. The way that the prison health system... What about the fact that he co-signed the note on June 1? That's why, that's what made me think that he had seen... What's the significance of that? Doesn't that mean that he supervised and reviewed the notes? He did review the note, yes. So how's that not involvement that would trigger the responsibility? Well, it is involvement, but I'm saying he did not see Mr. Bennett at that point. I see I'm over my time, but I would like to make a brief point about the dismissal for failure to prosecute of the FTCA case, if I may. We think that the Bennett's have forfeited any challenge to that, and we think that resolves the entire FTCA appeal because it bars them from challenging any earlier interlocutory orders. Why do you think they have waived their challenge to that? Well, they didn't oppose it below, and they didn't raise it in their blue brief. It's not any of the argument headings in their blue brief. Well, no, I read the transcript. It seems to me they vigorously opposed it in the sense that they said, Judge, don't do it. Dismiss it without prejudice. No, no. And you finally reach a point where the judge says to you several times, stop. I'm not going to do what you want. Do you have to, when he says, I'm going to do what you don't want, say, I object? I'm talking about a different order. So they tried to voluntarily dismiss without prejudice. Judge denied that. Then when we got to trial, they just sat there. They didn't put on a case. They presented no witnesses. I agree. If the earlier order was properly denied, there isn't any doubt that the judge properly dismissed for failure to prosecute. But that's a final order, and they're appealing that final order. They filed a notice of appeal from that final order. So your argument is they waived it because at the time the judge said, I'm dismissing for failure to, dismissing for failure to prosecute, they didn't stand up and say, Judge, remember we moved to stay. Remember we moved. I mean, they, hadn't they made enough of a record on that point to preserve it? No, no. What the El Torque case says is once that you get an interlocutory order that's, that's unfavorable to you, you can't just sit there and fail to prosecute and then try to appeal and challenge the earlier interlocutory orders. You have to finish, litigate the case through to a final judgment. Otherwise... In El Torque, as I recall, the interlocutory order wasn't a request to dismiss without prejudice, was it? No, but the other... I mean, that's one thing, you know, it, I understand how you don't, you may not have preserved their summary judgment argument by, by letting the case, but what were they supposed to do at trial if they wanted, were they supposed to put on their case and then object to the, to the failure to stay? They had three options. The first one was to go to trial, put on a case, and win or lose, they could have appealed that order and, and challenged the earlier interlocutory order. But they thereby would have given up their right to a jury trial on their Eighth Amendment claim. No, if they, if they had appealed afterwards, they could have challenged the earlier denial of their voluntary dismissal motion and tried to... Assuming, assuming they lost the case, right? Win or lose, they could have appealed. Sure, that'd be a great appeal. You've already tried your case, you've put on everything, now you're appealing the failure, my, failure to let me dismiss it before. Yeah, you can do that, I mean, this court's case... And you lose, and you lose that appeal, so that's a terrible strategy. What's their second, what's their second? They could have sought, the second one is, they could have sought interlocutory appeal under 1292B. Discretionary from the judge. It is, and the third is mandamus, and they've already filed a mandamus petition in this case. The fourth is, say, judge, okay, if that's what you're gonna do, that's what you're gonna do, but we're gonna appeal. And if they'd said those words at trial, would they have preserved their right to appeal? No, I don't, I don't think so, but, but even so, once we got to that point, the district court certainly didn't abuse its discretion by, when they, they didn't put on any witnesses, evidence... And I've told you before, I agree with you on that. The question is whether the court abused its discretion at some earlier point in time in turning down their, their request to dismiss without prejudice, and what you're saying is that's effectively unreviewable. Yes, when you... That whenever that happens, you've either got to come running up to us with an emergency discretionary application, or, in effect, say, I've lost that, I must try my case. Yes, you have to try it. I mean, that's what the final judgment rule is. You have to complete all the proceedings in the district court before you take an appeal. I mean, I know you're over time, but you're our only show this morning. Yeah, we'll keep you at the lectern until everybody's questions get answered. There is a final order in this case. Final judgment. There's a dismissal for failure to prosecute. That's a final judgment for purposes of, of the, of the civil statute, right? I don't think so. I think Al Torky says that in that situation, you can, you can appeal that, but first, before you can challenge any earlier interlocutors, you have to show that that... We're speaking past each other. We have a final judgment in this case, do we not? I don't think that would qualify... We don't have a final judgment, then we send the case, we say the case is still in the district court. We must have a final judgment. I would direct the court to the Supreme Court decision in that case. They don't say that a dismissal with prejudice for failure to prosecute is not a final judgment. You're making a different argument, that in the appeal of that final judgment, we can't take up interlocutory orders. Is there a case that says that that is not a final judgment for purposes of 1291? I think it's Microsoft, and Microsoft said that the plaintiff in that case voluntarily dismissed with prejudice, and on appeal, the Supreme Court said that is not a voluntary dismissal. The court here, over their objection, entered an order dismissing their case, and you're telling us that order is not appealable. That's your position? No, that is appealable, but it should be affirmed, and that bars the earlier... I understand that, but it's not what you just said. You just said we have this dismissal by the court with prejudice is not appealable. I think the court's rule is that you can appeal that, but you first have to show that that decision, dismissing for failure to prosecute... Then your appeal might fail on its merits. I understand that argument. In other words, we can't consider the interlocutory orders. We can only consider whether the judge abused discretion at the end, but that's very different than what you said. You just told us it wasn't an order we could review, but it's a final order. We can review it. We may turn down their appeal for all the reasons you said, but it surely is a voluntary dismissal. I think Microsoft says it's not. Microsoft said a voluntary... It was a voluntary dismissal with prejudice, right? There's a distinction here in that it was an order dismissing with prejudice over the objection of Mr. Bennett. Microsoft says when you dismiss your case with prejudice, don't come up here and appeal interlocutory orders. It makes perfect sense. You chose to dismiss your case with prejudice. You can't now come up and complain about what led to that, but this is not a voluntary dismissal with prejudice. This is an involuntary dismissal with prejudice. But I think it is effectively the same thing when they show up at trial and they refuse to proceed. They refuse to present any witnesses or evidence. But they can't appeal that. No way to appeal the judge's order. No, I think the way this court's cases say, Al-Turki is one of them, it says the first thing you have to do when you appeal that, you would have to first show that the dismissal for failure to... To the Court of Appeals. You would first have to show... Exactly. You would first have to show that to the Court of Appeals, and then you can get... See, I think we're missing each other on this. This case is properly before us. We get to determine whether or not this order... We have a final order. What your position is, even though the final order is in front of us, we can't look at interlocutory orders. We are... We can only focus on that day when the judge dismisses the case. Yes, I think that's right. Yes. Yeah, I think it's wrong, but at least I understand your position. Alright. Jesse Boyd, do you have anything for the government? No, thank you. Alright, thank you very much for your argument. Now, we've given the government plenty of time, so let's put five minutes on the clock for rebuttal. Thank you, Your Honor. I was about to say I plan to hustle through five points in under a minute. It's a relief to have a little bit more time. I'd like to start briefly picking up on Judge Hurwitz's questions to counsel about how the interlocutory orders are before the court. I could just touch on this briefly. Al-Turki, Microsoft, those cases are completely distinguishable from the situation we have there, where the plaintiff was actively seeking I think we think so, too. Okay, I'll skip that point, then. And I don't wanna spend a lot of time on the dismissal without prejudice issue, but I am a little troubled if we have to review the judge's order for abusive discretion. The judge had basically said, I want you to be prepared to try both cases, entered a summary judgment in one of them. Well, actually, he never said he would. I didn't say that, but surely his actions told you that. He wouldn't stay it. He wouldn't dismiss it without prejudice. So he had a trial date and you knew you had one. So I'm trying to figure out why the judge abuses his discretion by saying, I want you to get both cases ready. I now grant summary judgment in one of them. Only one remains. Try it. Why is that an abuse of discretion? The abuse of discretion is in completely disregarding this court's standards for a dismissal without prejudice, which require a showing of legal prejudice on the part of the defense. The only way we lose on a motion to dismiss without prejudice is if the defendant can make a showing of such legal prejudice. And Your Honor pointed that in your questioning. And the bar you think is not enough? Yes, I agree completely. The judgment bar is not a defense. The way the government characterizes the judgment bar is something akin to a qualified immunity defense that we can raise at any time. We have the ability to use this defense to guide what the plaintiff does. That's not at all the case. If you look to the Supreme Court's decision in Will v. Halleck, that's the case where the government took the position that the denial of a judgment bar motion to dismiss was not immediately appealable. And I said I don't wanna keep you on this too long, but I do have one other question. I've looked in the record. The government didn't say at that point, and we have witnesses that are ready and memories will fade, and the kind of prejudice showing one might expect otherwise. And even then, this Court's precedents, I think, say that mere delay is not legal prejudice. Legal prejudice is the loss of a defense, the loss of... Well, that's what I was asking. Our key witness is leaving the country. No, there was no showing... The defendant is elderly and is... The only prejudice they offered is... And what's interesting is that the United States was arguing that it was prejudiced by the inability to preserve the judgment bar for the individual defendants. Those are two completely different entities. We've got five defendants who are individuals, and we've got the United States as an entity. I don't think that the United States can actually raise prejudice to other parties. I apologize for taking you on the procedure. No, that's quite all right. What is it that you want to do with this case? You would like us to reverse the order dismissing the FTCA case with prejudice, to send it back so that it can be... An order can be entered dismissing it without prejudice, and then you want us to send the Bivens claim back for trial. That is correct. There is a request for relief that I would rank higher than that in terms of our order of priorities, and that is for the court to rule, I did not have an opportunity to mention this before, that the denial of the stay was improper. Now, I acknowledge this is an abuse of discretion standard when Judge Klausner denied our request to stay the FTCA case pending this court's review of the Bivens appeal, but the record at that time, given that the district court's order granting summary judgment did not consider any of the plaintiff's evidence, given that the plaintiff at that point had produced a record, which I've suggested to the court, had exceptionally strong evidence of deliberate indifference that should be presented to a jury, given also the plaintiff's view of this particular district judge's record in the court of appeals. Now, let me stop you with that. You asked to reassign this case. Perhaps I'm wearing my district judge hat, and so I have to ask you about this. And your basis for saying this should go to a different district judge is that you say in your briefs, this district judge has been reversed many times by the Ninth Circuit in relatively similar cases or something along that lines. Don't you think that's a pretty thin showing to make what I think is a very serious request to reassign to another judge? There's nothing in there that tells us how many times he's been affirmed or how it's related to other district judges. You just say, this judge has been reversed a lot by the Ninth Circuit, and so you should send it to a different district judge. Don't you think that's not really much of a basis to make that pretty significant request? Well, I think, Your Honor, maybe combining the... Let me say it this way. Our reference to the previous reversals is only a small part or a secondary part. So you've got to show bias. That's right. On the part of the district judge. And what bias do you have in this case? What's showing, other than the fact that you got what you consider to be unfavorable rulings? Because otherwise, we'd have to reassign every reversal to a new district judge. I understand that. The bias or the appearance of bias comes in the district court's repeated statements in the court's rulings on the stay and on the motion to dismiss. And the statements are? Suggesting that the plaintiffs have attempted to commandeer the court's docket, are seeking second bites at the apple, and essentially accusing the plaintiffs in engaging... The court is managing... He's managing it maybe improperly, maybe incorrectly. He's saying, look, I've got these two cases on my docket. I wanna dispose of them. I've disposed of one by summary judgment. Let's take the other one to trial. And we'll sort... And so why is that such bias that it requires the extraordinary remedy of taking the judge off the case? The bias is shown by the fact that the district court did not consider in any way a right recognized by every case to ever consider... That's error. That's error. That's not bias. It is error plus. And that's... It's not error plus. District judges all the time in the course of a case come to conclusions about the positions that the parties are taking and whether or not they're taking positions in good faith or bad faith or what have you. And they may be wrong in that decision, but that's not bias. That's simply decisions that they're making that are then reviewed by the appellate court. But to then suggest that every time a judge says, for example, I don't think you're proceeding properly, or I don't think that this is appropriate strategy or what have you, to say, aha, that judge has suddenly become biased against that side would wreak havoc and would also, frankly, be an insult to the district judges. And I disagree as to the specific showing in this case. I do think that there was actual bias, but I... You don't have any showing of personal animosity by the judge to anybody in this case, do you? No, we do not. You don't have any showing of the judge having extra judicial influences on the case? I've read in the paper that your client's a bad guy or something like that. No, but what we do have... So what you have is a bunch of rulings, and look, you chose to make this argument, therefore we get to deal with it. Sure. What you have is a show. And I don't think, under those circumstances, an appellate brief should ask for reassignment of a judge. So as I said to your colleague with respect to it's not an appealable order argument, I don't buy it. I understand that, and let me... If I could just defend the reason for the request, it's not necessarily the showing that we need to make a showing of actual bias. No. It is a showing of the appearance of bias. And the appearance of bias must arise from something more than the fact that you didn't prevail on each of your arguments. And given the combination of factors here, I'll rest on that, it's the combination of factors. The summary judgment ruling followed by the denial of the stay, followed by the denial of the motion to dismiss without prejudice, and a completely unprecedented ruling, not supported by any authority, all the while suggesting that it's the plaintiff's fault. It's the plaintiff's fault for exercising their election of remedies, which they have a recognized right to do. When you see statements like that from the plaintiffs, I would suggest that there is an appearance. Let me ask you this. Just to comment on what you've been discussing with my colleagues here, you've got a judge who's very actively managing his docket. You know he does that. We know that too. I don't think you really get beyond that. But why did the FTCA case fall so far behind the Bivens claim? Could you have waited, or were you dealing with a statute problem on the Bivens case? Well, preliminary, there was a statute of limitations that expired on the Bivens case, which required immediate filing as soon as we as counsel got involved in the case. The FTCA administrative exhaustion was prolonged because of good faith negotiations with BOP counsel. There was an effort to preserve the case. You filed a Bivens case to preserve the claim, and the FTCA fell far behind because you were trying to work it out. That's exactly right. That's exactly right. But throughout that process, there was understanding among all parties that the Bivens case would have been resolved. And of course, resolving the FTCA case would have resolved everything, and the Bivens case would have been dismissed. If those negotiations were not successful, the cases would be combined. In fact, our Rule 26F statement, this is on page 1328 of the record, had an acknowledgment from all parties that the cases would be combined. I know that there was a stipulation to consolidate. Correct. Did you try to secure a stipulation to stay the Bivens claim while you worked out the FTCA case with the government? No. At that time, we did not think it was necessary because we envisioned that the consolidation would not be a problem. But you knew that at some point, the government opposed the stay. Well, so I think Judge Wynn was referencing a stay of the Bivens case as opposed to a stay of the FTCA. Early on in the stay so that the district court really didn't have to do anything. There's no discovery taken, and the parties didn't have to litigate the case, essentially. So if you were doing it as a strategic matter, knowing that the FTCA case would be so far behind the Bivens claim, I would think the first thing to do is reach out to the government and get a stipulation to stay the case. We were in prolonged discussions about this throughout. The discovery in the Bivens case had not taken... In fact, there were no depositions that had taken place before the FTCA case was filed. It was preliminary exchange of documents, which was relevant to the FTCA negotiations in any event. If we had gotten to the point where the FTCA case had dragged on and on and on and the Bivens discovery was proceeding, I'm sure that would have been... Let me ask a question that you don't have to give an answer to. Your statement about prolonged negotiations always leads me in a case like this to ask whether or not the parties would benefit from mediation. I suspect you're too far down the road in this case for that to be true, but... I think... You don't have to answer it, but if the parties are, you should talk to each other and tell the court if you wanna do it. I think... You don't have to answer the question. I don't want you to talk about settlement. Okay. I'm just saying if the two of you talk and think mediation would be appropriate, tell us. Thank you, and I appreciate that, Your Honor. I've gone way over at this point. I did wanna take an opportunity to reference the liability of each of the Bivens defendants. Well, no. Let me see if any of my colleagues have questions, and then I think we can wrap up this argument. Okay. Alright. Thank you very much on both sides. And if you are interested in entering mediation, if you can notify us at this time. Alright. We're in recess for the day.
judges: Nguyen, Hurwitz, Seeborg